OPINION OF THE COURT
Angela M. Mazzarelli, J.
At a lineup conducted on January 25, 1990 at the Midtown South Precinct’s station house, Sun Ok Kim identified Kenneth Green as the perpetrator of an assault, robbery, and *195 attempted burglary committed two weeks earlier. Defendant moves on two related, but distinct, grounds to suppress testimony about the lineup and to preclude Ms. Kim from making an in-court identification of him at trial. He contends that the out-of-court identification proceedings were unnecessarily suggestive and that the prosecutor has failed to establish an independent source for a trial identification. Green alternatively argues, in a more novel fashion, that such identification evidence is inadmissible because he has demonstrated that it is scientifically unreliable. For the reasons set forth below, defendant’s motion is denied in toto.
FINDINGS OF FACT

The Incident: January 11, 1990

At about 7:00 a.m. on January 11, 1990, Sun Ok Kim rode an elevator up to the second floor of 270 West 39th Street to go to work as a seamstress. Ms. Kim was standing in the hallway, which was illuminated by lights in the ceiling, when she was approached by a man from her left side. This man, who came within two feet of Ms. Kim, and who stood face to face with her, demanded that he be given the keys to the factory premises. Although Ms. Kim tried in vain to explain that she was awaiting her employer’s arrival and that she did not have the keys, the would-be burglar continued to press his demand.
The man, who was Hispanic, with dark and curly hair, and taller than Ms. Kim, was dressed in black clothes. He began to hit, kick, and punch Ms. Kim in the chest, head, and stomach. When Ms. Kim fell down, the assailant grabbed her by the arm, pulled her up, and dragged her down the hall into the bathroom. There, ignoring Ms. Kim’s protestations, the man continued to insist that she produce the keys to the factory door; accused her of lying, and threatened to kill her. He also carried on the physical assault of Ms. Kim by beating and "standing” on her. The two argued back and forth in English about the keys some 20 times. Ms. Kim clearly saw the man’s face "in the hallway and also in the bathroom.” Indeed, she had "quite [a] long time, maybe fifteen minutes” to observe the perpetrator before she passed out from her injuries.
When Police Officer Frank R. Favilla later responded to the scene of this attack, he discovered a long metal pipe protruding out of a plaster wall. He also found a pocketbook and blood outside the factory door. Inside the bathroom was more *196 property and blood. Ms. Kim had already been taken to the hospital by emergency medical service workers.

The Lineup: January 25, 1990

After he was arrested in the early morning of January 25, 1990 on an unrelated attempted burglary, Kenneth Green was brought up to the Midtown South RIP Unit after other officers recognized him as someone wanted in connection with other crimes. Upon seeing Green that morning, Police Officer Fa-villa decided to organize a lineup in connection with the January 11, 1990 incident. Favilla called Ms. Kim at home and indicated in English that he had a possible "suspect”. He asked Ms. Kim if she could come to the precinct to view a lineup. A police officer named Mike and another officer went and picked Ms. Kim up at her home. Meanwhile, Favilla also contacted Myong Devitt, the sister of the factory’s owner. At the request of Police Officer Favilla and Ms. Kim, Devitt, who is more conversant in English than the complainant, also came to the precinct.
Upon arriving at the precinct at about 6:00 p.m., the two women were escorted to the Peddler Unit’s office to await Police Officer Favilla’s completion of the final lineup preparations. Detective McGuiggan obtained the fillers. As the women sat around waiting, they nervously smoked cigarettes. Prior to the lineup they were not shown any photographs nor did they inadvertently see any detainees or prisoners. Although Ms. Kim expressed some apprehension about the lineup procedure, she was not, at this point, visibly upset or crying. Indeed, Devitt and Favilla endeavored to assure Ms. Kim that the "one-way mirrors” used in a lineup would afford her a degree of anonymity. The two did not expressly tell Ms. Kim that the defendant was in police custody, but rather tried to make her understand that she was not undertaking the risk of another assault by viewing the lineup.
Police Officer Favilla brought Ms. Kim and Ms. Devitt to the lineup viewing area at about 6:30 p.m. Ms. Kim needed to step on a chair in order to be able to look through the window of the one-way mirror. Upon looking at the lineup, Ms. Kim became agitated and upset, and began to cry. In Korean she indicated to Ms. Devitt that her attacker was in the lineup and that he was number three. Police Officer Favilla helped Devitt calm Ms. Kim down and asked Kim whether she recognized anyone in the lineup. Ms. Kim, using her fingers, indicated the number three. Kim then articulated the number *197 three, and later wrote it and her signature on the lineup sheet. When she identified defendant as her assailant, Ms. Kim emphasized to Ms. Devitt that she recognized his face and not just the color of his clothes.

Expert Witness Testimony

Justin Anderson, an experimental psychologist who worked with Dr. Robert Buckhout as a graduate student at the City University of New York’s Graduate Center, testified about studies in the area of eyewitness identification, human perception, and cognition. Anderson explained that, counter to what one may intuitively believe, there is no correlation between the "degree of confidence” or certainty a witness expresses in his or her identification and the "accuracy” of that identification. Secondly, according to Anderson, the impact of "stress” at the time of the initial perception on a witness’s ability to later make a correct identification follows an inverted U-shape curve known as the Yerkes-Dodson law. Thus, lower levels of stress help improve performance, while great levels of stress, that is hysteria, at the time of the initial sighting reduces the likelihood of a subsequent identification being accurate to less than 50%. Apparently the studies performed thus far have not explored the effect, if any, of stress at the time of the subsequent identification procedure, i.e., the lineup.
Anderson defined "suggestiveness” as occurring when "an authoritarian body * * * either knowingly or unwittingly supplies or formulates a direction for a person to move in, or travel in.” He then testified, however, that he "didn’t see anything particularly suggestive” in the testimony of Police Officer Favilla, which he had previously read. This was so because the officer did not isolate specific characteristics or details.
CONCLUSIONS OF LAW
[The court then concluded that the lineup procedures were not so unnecessarily suggestive as to violate the due process protections of the Federal and State Constitutions. This discussion has been omitted for the purposes of publication.]
Defendant maintains that regardless of how the lineup fares under traditional Federal and State constitutional due process analysis, all identification testimony here should be barred because he has established that it is "scientifically unreliable.” While this court agrees that there is a "growing body of *198 research concerning the reliability of eyewitness identifications” (People v Mooney, 76 NY2d 827, 828 [1990] [Kaye, J., dissenting]), it is by no means convinced that in the case at bar it has been established that Ms. Kim’s identification of defendant falls on the latter half of the Yerkes-Dodson curve. Indeed, defendant’s analysis assumes certain variables and facts not in evidence. For example, there was no testimony "quantifying” Ms. Kim’s level of stress at the time of her initial encounter with the perpetrator. Defendant confuses that unknown "stress” level with the "stress” level exhibited at the time of the identification confrontation and which was testified about by the witnesses. According to his own expert, the effect of the latter on accuracy has not yet been studied by experimental psychologists. Furthermore, the defendant’s argument is also premised on a diagnosis of posttraumatic stress disorder, which, as already discussed [this portion of the findings of fact was omitted for purposes of publication], is unsupported by the record.
Nevertheless, assuming arguendo, that defendant is correct that the probability he was accurately identified is less than Vz, it does not necessarily follow that the identification testimony could not, with proper instructions, be submitted to the jury. Whether the defendant is in fact the person who committed the crimes alleged is ultimately, as always, a question within the province of the jury as finder of the facts. Thus, for example, if it could be said that there is only a Vk chance defendant was accurately identified, it remains for the jury to decide whether it has been established beyond a reasonable doubt that on this occasion the identification was that one chance of four.
Otherwise stated, the thrust of defendant’s argument affects the weight of identification testimony and not its admissibility. "Certainty of identification” is simply not a prerequisite to admissibility. (See, People v Strollo, 191 NY 42 [1908]; People v Trybus, 219 NY 18 [1916]; People v Spinello, 303 NY 193 [1951].)