Anthony Wayne ROBERSON,
Appellant,

v.

The STATE of Texas, Appellee.

No. 03–98–00590–CR.

Court of Appeals of Texas,
Austin.

April 13, 2000.

Robert Icenhauer–Ramirez, Icenhauer–Ramirez & Hubner, P.C., Austin, for Appellant.

Philip A. Nelson, Jr., Asst. Dist. Atty., Austin, for State.

Before Chief Justice ABOUSSIE, Justices PATTERSON and ONION.*

JOHN F. ONION, Jr., Justice (Retired).

This appeal presents an issue that borders on being a case of first impression in

---

* Before John F. Onion, Jr., Presiding Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).

Texas: Can DNA (deoxyribonucleic acid) [1] evidence alone establish a legally and factually sufficient case of a defendant's guilt in a criminal prosecution? The core concern involves the question of identity.

■ Appellant Anthony Wayne Roberson appeals his conviction for aggravated sexual assault. *See* Tex. Penal Code Ann. § 22.021(a)(1)(A)(i), (2)(A)(ii), (iii) (West Supp.2000).[2] The jury found appellant guilty "as alleged within the indictment." [3] The trial court assessed punishment at life imprisonment and made the sentence cumulative with another life sentence for aggravated sexual assault.

## Points of Error

Appellant advances two points of error. Appellant claims that the evidence is legally and factually insufficient to show that he was the perpetrator of the offense charged. Appellant does not claim that the trial court erred in admitting the DNA evidence but urges that the DNA evidence standing alone does not show that he was the person who committed the offense alleged. He notes that the complainant could not describe her assailant in any manner and that there was no other circumstantial evidence of identity like fingerprints, trace evidence, or physical proximity to the crime scene—to link him to the offense. Appellant argues that DNA evidence is not an inclusionary tool but one of probability. He contends that DNA

testing can exclude someone as the donor of semen, but it cannot definitively link someone to a crime without other evidence.[4] We will affirm the conviction.

## Facts

In the early morning hours of November 4, 1990, R.P. was sexually assaulted in her Northwest Hills home in Austin. She was unable to identify her assailant. On Saturday, November 3, 1990, R.P.'s husband and their nine-year-old son went hunting. That evening, R.P. allowed her other two children, ages seven and three, to sleep in her upstairs bedroom as a treat. R.P. awakened at about 3:20 a.m. on November 4th but went back to sleep.

Sometime later, R.P. was awakened when she felt a moist gloved hand over her mouth. A male voice said, "Don't say a word. If you love your children, you will not say a word." In the dark, the man pulled R.P. from the bed, led her across the hall to a game room and pushed her to the floor. He told R.P. not to look at him and demanded the location of her cash and jewelry. She denied having cash but told the man she had rings and a gold and diamond watch. When R.P. inquired how he got into the house and what was going to happen, the man repeatedly told her to "Shut the f—— up." R.P. thought that she was going to die and was concerned about her sleeping children.

1. "DNA—deoxyribonucleic acid, [is] the chemical molecule inside cells which carries biological information. DNA is a double stranded molecule held together by weak hydrogen bonds between complementary base pairs of nucleotides (Adenine and Thymine; Guanine and Cytosine). This molecule carries genetic information from parent to offspring." Robert D. Myers, Ronald S. Runstein, & Gordon M. Griller, *Complex Scientific Evidence and The Jury*, 83 Judicature Nov.-Dec.1999 at 150.

2. The current code is cited for convenience. The offense occurred on November 4, 1990. The prosecution was under the Act of July 18, 1987, 70th Leg., 2d C.S., ch. 16, § 1, 1987 Tex. Gen. Laws 80. The law has remained unchanged despite amendments to the statute in 1993, 1995, 1997, and 1999.

3. The jury's general verdict did not distinguish between the two theories of the offense alleged. When different theories of an offense are submitted to the jury in the disjunctive as in the instant case, a general verdict is sufficient if the evidence supports one of the theories. *See Fuller v. State*, 827 S.W.2d 919, 931 (Tex.Crim.App.1992); *Kitchens v. State*, 823 S.W.2d 256, 257–58 (Tex.Crim.App.1991).

4. We deal here with the issues presented, not with the cases where DNA evidence has been used to exclude suspects or exonerate convicted defendants.

The intruder took R.P. downstairs and into her son's bedroom, searched the room with a flashlight, picked up a blanket and placed it over R.P.'s head. The man then bound R.P.'s hands behind her back with masking tape obtained from the kitchen, took her to the living room, and told her not to move or she would not see her children again. The man returned with her jewelry and some of her husband's possessions. When R.P. could not tell him the location of the key to a gun case, he reached under R.P.'s night gown and pulled her panties down, telling her that this might help her remember the key's location.

After a futile search for the key, the man returned R.P. to her son's bedroom. When R.P. realized the man's intentions, she ripped the tape off her hands, but the man hit her in the face with his fist knocking her onto the bed. The man then had vaginal intercourse with R.P.

After the sexual assault, the intruder made R.P. urinate in the bathroom and then retied R.P.'s hands with a jump rope. He disabled all six telephones and instructed R.P. to urinate again. He told her he was leaving. After a few minutes, R.P. removed the blanket from her head. The man was still in the bathroom, shined a flashlight in her eyes, and told her not to look at him. R.P. stayed in the bathroom until she heard the man leaving the house through broken glass.

R.P. immediately ran upstairs to check on her children who had slept through the entire episode. R.P. then activated the panic button on her security system.[5] The police arrived in twenty minutes. It was determined that the point of entry had been made by breaking the glass in a sliding door leading into the living room from a patio. R.P. was taken to the hospital for a rape examination. R.P. was unable to identify her assailant at the time of

the offense or at trial almost eight years later.

Ginger Braley–Cochran, a registered nurse, performed a sexual-assault examination on R.P. at Seton Hospital. She collected R.P.'s robe, nightgown, panties, and panty liner. She obtained two oral swabs, hair combings, scrapings from under the fingernails, and two vials of blood. The evidence was placed in a rape kit and given to an Austin police officer. Bradley–Cochran testified as to abrasions, bruises, and rope burns on R.P.'s body.

Dr. John Walker, an emergency room physician, performed a sexual assault examination on R.P. and found sperm in her vaginal fluids. He collected several vaginal swabs. The chain of custody of all the evidence was established.

Steve Robertson, a supervisor in the criminalistic section of the Texas Department of Public Safety Crime Laboratory in Austin, testified that he was present in the lab when the rape kit and other evidence relating to the instant offense was brought to the lab on November 14, 1990. Robertson began work on the evidence on November 26, 1990. He tested the semen on the vaginal swabs for blood group typing and secretor status. He also typed the complainant's blood which showed that R.P. had a PGM type 1+. Robertson determined that her assailant was a blood group O secretor or else was a nonsecretor of any blood type with a PGM of 1 minus or 1 minus, 1 plus.

Austin Police Detective Robert Travis testified that almost three years after the offense, he obtained and executed a search warrant for appellant's blood, hair, semen, and saliva samples. He identified a state's exhibit as the samples he obtained from appellant and delivered to the DPS Crime Lab on October 15, 1993.

Robertson testified that on October 15, 1993 he received appellant's blood sample

---

5. R.P. testified that she "set" the security system before she retired. Why it did not

work was not clearly explained.

and the blood typing revealed appellant to be a blood group O secretor with a PGM type of 1 minus, 1 plus. Robertson testified that, based on his testing in the lab, appellant could not be eliminated as being the donor of the semen in question, including the semen stain on the complainant's nightgown. Robertson acknowledged that blood group O with a PGM type 1 minus, 1 plus was found in approximately nine to ten percent of the male population.

Michelle Lockhoof, a DNA analyst and serologist with Codis (Combined DNA Index System) of the Texas Department of Public Safety Crime Laboratory, testified as an expert witness for the State. Lockhoof graduated from the University of Texas with a B.A. degree with a major in biology. Upon graduation, she immediately began working in the DPS lab. She had on-the-job training, attended numerous seminars, conferences, workshops, and had "some continuing education at the University." She had testified about seventy times in courts all over Texas.

Lockhoof explained that the DPS crime laboratory was certified by the American Society of Crime Laboratory Directors (ASCLD), an oversight agency that determines if the lab is following established guidelines and protocol. The protocol used in the DPS lab is in accordance with the guidelines from Technical Working Group on DNA Analysis Methods (TWGDAM), a national organization, and in compliance with the recommendations of the National Research Council (NRC).

Lockhoof related that the DPS crime lab uses proficiency testing on its caseworkers—usually blind testing. Lockhoof revealed that since January 1994 she had undergone eight or nine proficiency tests and most of the tests were conducted by outside agencies. She never had been advised that she had made a mistake or reported a false match on any proficiency test. Lockhoof reported that it was not uncommon to have DPS lab work re-analyzed by private laboratories. Seventy to eighty percent of her work was eventually reviewed by outside agencies.

Lockhoof explained that DNA is a chemical found in human cells; that all humans have some DNA that is the same; and that is why most humans have two arms, two legs, and two eyes. Other characteristics of most individuals are different because an individual inherits one-half of his DNA from his mother and one-half from his father.

Lockhoof explained that DNA analysis is used in areas other than forensic DNA for use in court proceedings; that DNA testing is used to identify war dead, to determine paternity, and to ensure an individual can receive and not reject an organ transplanted from a donor. There are two main DNA-testing methods, one of which is polymerase chain reaction (PCR). Lockhoof described PCR as a quick test that can be used in testing small stains. It is often utilized when there is a need to know the results in a short time. The other main test is restriction fragment length polymorphism (RFLP). This test requires a larger stain and it takes a longer time to reach a result than the PCR test.[6] In the RFLP test, the analyst is looking for the size or length of an individual's DNA and needs a large DNA stain and good quality DNA. The PCR test may use a smaller stain and the DNA need not always be of the same quality as in the RFLP test.

After explaining how these two testing methods work, Lockhoof related that she performed RFLP testing on semen stains from the complainant's nightgown, a panty liner, and a vaginal swab, and appellant's known blood. She testified as to a visual match between these items and that appellant could not be excluded as a donor of

6. The RFLP analysis has been discussed in many cases and periodicals. *See, e.g., State v. Futrell,* 112 N.C.App. 651, 436 S.E.2d 884, 888 (1993); Judith E. Lewter, Note, *The Use of Forensic DNA in Criminal Cases in Kentucky as Compared with Selected Other States,* 86 Ky. L.J. 223 (Fall 1997/1998).

the semen.[7] Lockhoof then related that the DPS crime lab used a database developed by Dr. Arty Eisenberg of the University of North Texas Health Science Center derived primarily from DNA paternity testing, a field in which Dr. Eisenberg is a renowned scientist. The database had been evaluated by Dr. Ranajit Chakraborty of the University of Texas Health Science Center in Houston and adopted by the DPS. The database contains the following approximate number of alleles (type or size of DNA) for the various ethnic groups—Caucasian–3,800 alleles; Black–4,400 alleles; and Hispanic–5,000 alleles.[8]

Lockhoof stated that she could tell the jury how rare the DNA profile of appellant, an African–American, is in the population. Taking the sizes of DNA from appellant's known blood sample and looking at the database, Lockhoof was able to determine how frequently the overall profile occurred in different populations. Although Lockhoof first testified that appellant's profile occurred in approximately 1 in 5.5 billion for the Caucasian, Black, and Hispanic populations combined, she pointed out that the *actual* frequency was 1 in 230 billion for Caucasians, 1 in 420 billion for Blacks, and 1 in 630 billion for Hispanics. Lockhoof explained that as a result of a policy decision, the DPS crime lab does not report ratios higher than the world's known population at the time of the DNA test, hence, the 1 in 5.5 billion ratio.

Dr. David Bing testified that at the time of the trial (December 1997) he was the scientific director of a company called Genomice Collaborative in Boston, Massachusetts, a relatively new position. He had been the director for all clinical and forensic DNA testing at the Center for Blood Review in Boston.

In 1960, Dr. Bing received his Ph.D. degree in microbiology from Case Western Reserve University. After two years post-doctoral training at the University of California at Berkeley, he became associate professor at Michigan State University. In 1973, Bing moved to the Center for Blood Review (CBR) in Boston and also became a member of the Harvard University Medical School faculty. In 1986, he became director of all clinical testing at CBR and continued teaching at Harvard. He related that he had testified in court approximately seventy-five times. He testified that he had done both PCR and RFLP DNA testing and was an expert in both types of testing.

Bing related that he was asked to do PCR testing on the complainant's blood, one of the vaginal swabs from the rape kit, and appellant's blood. Bing described the testing procedure used and summarized his results concluding that appellant could not be excluded as a donor of the sperm found on the vaginal swab and that the frequency of appellant's DNA profile in the African–American population would be 1 in 1600. Bing explained that in 1992–1993, under the recommendation of the National Review Council Report I, labs only reported the frequencies that certain alleles or certain DNA types appeared in the population. By virtue of the 1996 NRC Report II, these frequencies could be reported as a likelihood ratio: a likelihood that a given set of DNA profiles came from a specific individual as opposed to another random person in the population. Bing performed his PCR testing in December 1994 and concluded that under the 1996 guidelines the likelihood ratio of appellant's DNA profile in the African American population would be 1 in 1800, not a

---

7. On the panty liner, Lockhoof revealed that in addition to appellant's semen, the semen of another male was found. R.P. testified that on the night before her husband left on his hunting trip they had had sexual intercourse, and she had not changed her panty liner since that time.

8. Lockhoof stated that the 1996 National Research Council Report II recommended a database of at least 200 samples for use on DNA case work. *See generally* National Research Council, Committee on DNA Forensic Science: An Update, The Evaluation of Forensic DNA Evidence (1996).

significant change from the standards employed under the NRC Report I. In further explaining the PCR testing he performed, Bing agreed that it was much less discriminating than the RFLP testing. He further noted that the forensic genetics community used the 1996 NRC Report II as a reliable source and guideline for reporting.

At the close of Dr. Bing's testimony, the State rested, the trial court overruled appellant's motion for an instructed verdict, and appellant rested without offering any evidence.[9] The jury returned its general verdict finding appellant guilty of aggravated sexual assault.

### Penalty Stage of Trial

At the second stage of the bifurcated trial, the State called four female witnesses, all of whom lived in the northern part of Austin. M.S. testified that appellant had been convicted of aggravated sexual assault in 1995 based on an August 16, 1991 offense.[10] She revealed that the offense occurred in her home and she was the victim. M.S. related that she was unable to identify appellant based solely on the events that occurred in the early morning hours on the day of the offense. S.T., G.B., and H.B. each testified to an extraneous unadjudicated aggravated sexual assault that occurred in their homes in the early morning hours of June 30, July 13, and July 15, 1991, respectively. None of the three women could identify appellant as the perpetrator of the offense in her individual case. Michelle Lockhoof, the DPS DNA analyst, testified that sperm and other items of evidence from these three extraneous offenses were compared with appellant's DNA profile. She found that appellant could not be excluded as the donor of the sperm in each case. Lockhoof again testified that there was a 1 in 5.5 billion chance in each offense that appellant's DNA profile would match another individual.[11]

9. The record reflects that DNA samples and specimens were sent by the DPS laboratory to the Gen Screen laboratory in Dallas. In the absence of the jury, appellant's counsel admitted that the Gen Screen lab had been retained by appellant to perform DNA testing on the samples, that the results had been received, but the results would not be offered by appellant. It has been said that a "wrongly accused person's best insurance against the possibility of being falsely incriminated is the opportunity to have the testing repeated." *United States v. Lowe*, 954 F.Supp. 401, 416 (D.Mass.1996), *aff'd*, 145 F.3d 45 (1st Cir. 1998) (quoting National Research Council Committee on DNA Forensic Science: An Update, The Evaluation of Forensic DNA Evidence at 3–11 (1996)).

10. See *Roberson v. State*, No. 03–96–00067– CR, 1997 WL 420979 (Tex.App.—Austin July 24, 1997, no pet.) (not designated for publication).

11. Interestingly, the four extraneous offenses all involved the same type of offense and revealed a distinctive *modus operandi* that was so unusual as to mark each offense as one person's handiwork or signature. *See Lane v. State*, 933 S.W.2d 504, 519 (Tex.Crim. App.1996); *Taylor v. State*, 920 S.W.2d 319, 322 (Tex.Crim.App.1996); *Barrett v. State*, 900 S.W.2d 748, 750 (Tex.App.—Tyler 1995, pet. ref'd). When extraneous offense evidence is offered to prove identity on a *modus operandi* theory, it is, of course, crucial that the two offenses share distinguishing characteristics common to both. *See Dickey v. State*, 646 S.W.2d 232, 235 (Tex.Crim.App.1983); *Collazo v. State*, 623 S.W.2d 647, 648 (Tex. Crim.App.1981).

Rule 404(b) provides that evidence of other crimes, wrongs, or acts is not admissible to prove the character of the person in order to show that he acted in conformity therewith. *See* Tex.R. Evid. 404(b); *Taylor*, 920 S.W.2d at 321; *Montgomery v. State*, 810 S.W.2d 372, 386 (Tex.Crim.App.1991) (op. on reh'g). However, extraneous offense evidence may be admissible to prove an elemental fact or an evidentiary fact of consequence to the determination of the case. *See Vernon v. State*, 841 S.W.2d 407, 411 (Tex.Crim.App.1992). In this regard, Rule 404(b) also provides that such evidence may be admissible for the purpose of proving motive, opportunity, intent, preparation, plan, knowledge, *identity*, or absence of mistake or accident. Tex.R. Evid. 404(b). Thus, when identity is an issue in a case, and the proper foundation or predicate is laid, an extraneous offense may be admissible at the guilt/innocence stage of the trial to show identity. *See Lane*, 933 S.W.2d at 519; *Moore v. State*, 700 S.W.2d 193, 201 (Tex. Crim.App.1985).

Here again, appellant rested and closed without offering any evidence. The trial court then assessed punishment at life imprisonment.

## Legal Sufficiency

■ The standard for reviewing the legal sufficiency of evidence is whether, viewing the evidence in the light most favorable to the jury's verdict, any rational trier of fact could have found beyond a reasonable doubt all the essential elements of the offense charged. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Skillern v. State*, 890 S.W.2d 849, 879 (Tex.App.—Austin 1994, pet. ref'd). The standard of review is the same in both direct and circumstantial evidence cases. *See King v. State*, 895 S.W.2d 701, 703 (Tex.Crim.App.1995); *Green v. State*, 840 S.W.2d 394, 401 (Tex. Crim.App.1992). The State may prove its case by circumstantial evidence if it proves all of the elements of the charged offense beyond a reasonable doubt. *See Easley v. State*, 986 S.W.2d 264, 271 (Tex.App.—San Antonio 1998, no pet.) (citing *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781). The sufficiency of the evidence is determined from the cumulative effect of all the evidence; each fact in isolation need not establish the guilt of the accused. *See Alexander v. State*, 740 S.W.2d 749, 758 (Tex.Crim.App.1987). It is important to remember that all the evidence the jury was permitted, properly or improperly, to consider must be taken into account in determining the sufficiency of the evidence. *See Garcia v. State*, 919 S.W.2d 370, 378 (Tex.Crim.App.1994); *Johnson v. State*, 871 S.W.2d 183, 186 (Tex.Crim.App.1993); *Rodriguez v. State*, 939 S.W.2d 211, 218 (Tex.App.—Austin 1997, no pet.).

Here, identity was an elemental fact the State was required to prove. The complainant was unable to identify appellant as her assailant. Appellant cross-examined the State's expert witnesses on this issue. The State's need for the extraneous offense evidence was great. *See Pena v. State*, 867 S.W.2d 97, 99 (Tex.App.—Corpus Christi

■ The sufficiency of the evidence to support a conviction should no longer be measured by the jury charge actually given but rather measured by the elements of the offense as defined by a hypothetically correct charge. *See Curry v. State*, 975 S.W.2d 629, 630 (Tex.Crim.App.1998). "Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability and adequately describes the particular offense for which the defendant was tried." *Malik v. State,* 953 S.W.2d 234, 240 (Tex.Crim.App.1992).

■ The jury is the exclusive judge of the facts proved, the weight to be given the testimony, and the credibility of the witnesses. *See* Tex.Code Crim. Proc. Ann. art. 38.04 (West 1979); *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex.Crim.App.1995); *Adelman v. State*, 828 S.W.2d 418, 421 (Tex.Crim.App.1992). The jury is free to accept or reject any or all of the evidence presented by either party. *See Saxton v. State*, 804 S.W.2d 910, 914 (Tex.Crim.App. 1991). The jury maintains the power to draw reasonable inferences from basic facts to ultimate facts. *See Welch v. State*, 993 S.W.2d 690, 693 (Tex.App.—San Antonio 1999, no pet.); *Hernandez v. State*, 939 S.W.2d 692, 693 (Tex.App.—Fort Worth 1997, pet. ref'd). The reconciliation of evidentiary conflicts is solely within the province of the jury. *See Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex.Crim.App.1995).

■ Under the *Jackson* standard, the reviewing court is not to position itself as a thirteenth juror in assessing the evidence. Rather, it is to position itself as a final due process safeguard insuring only

1993, pet. ref'd). It appears that the extraneous offense evidence would have been relevant evidence at the guilt-innocence stage of the trial provided its probative value was not substantially outweighed by the danger of unfair prejudice. *See* Tex.R. Evid. 403. The State, however, used the evidence only at the penalty stage of the trial.

the rationality of the fact finder. *See Moreno v. State,* 755 S.W.2d 866, 867 (Tex. Crim.App.1988). It is not the reviewing court's duty to disregard, realign, or weigh the evidence. *See id.* The jury's verdict must stand unless it is found to be irrational or unsupported by more than a "mere modicum" of evidence, with such evidence being viewed under the *Jackson* light. *See id.* The legal sufficiency of the evidence is a question of law. *See McCoy v. State,* 932 S.W.2d 720, 724 (Tex.App.— Fort Worth 1996, pet. ref'd) (citing *Matson v. State,* 819 S.W.2d 839, 846 (Tex.Crim. App.1991)).

Before addressing the sufficiency of the DNA evidence to support the instant conviction, we will briefly examine the admissibility of DNA evidence as background.

### DNA Identification Evidence— Admissibility

■ DNA identification is generally admissible in most American jurisdictions. *See* Paul C. Giannelli, *The DNA Story: An Alternative View,* 88 J.Crim. L. & Criminology 380, 380–81 (1997) (reviewing Harlan Levy, *And the Blood Cried Out* (1996)); Thomas J. Fleming, Annotation: *Admissibility of DNA Evidence,* 84 A.L.R.4th 313, 335 (1991). The first reported case in which DNA evidence was held admissible was *Andrews v. State,* 533 So.2d 841 (Fla. Dist.Ct.App.1988). "No other scientific technique has gained such widespread acceptance so quickly"; and "no other technique has been as potentially valuable to the criminal justice system." Giannelli, 88 J.Crim. L. & Criminology at 381–82. DNA evidence has been called the "single greatest advance in the 'search for the

truth' ... since the advent of cross-examination." *People v. Wesley,* 140 Misc.2d 306, 533 N.Y.S.2d 643, 644 (N.Y.Sup.Ct. 1988), *aff'd,* 183 A.D.2d 75, 589 N.Y.S.2d 197 (N.Y.App.Div.1992).

DNA evidence has certainly been held admissible in Texas. *See Kelly v. State,* 824 S.W.2d 568, 573 (Tex.Crim.App.1992). Even prior to *Kelly,* DNA evidence was found admissible. *See Mandujano v. State,* 799 S.W.2d 318, 321–22 (Tex.App.— Houston [1st Dist.] 1990, no pet.); *Glover v. State,* 787 S.W.2d 544, 547 (Tex.App.— Dallas 1990), *aff'd,* 825 S.W.2d 127, 128 (Tex.Crim.App.1992) (citing *Kelly* ).

In *Kelly,* the court delineated the standard for the admissibility of novel scientific evidence which in that case involved DNA identification evidence (the RFLP method). In *Kelly,* the "Frye doctrine" (*Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923)) was abandoned. In establishing the new standard, the *Kelly* court utilized Rules 702 and 403 of the Texas Rules of Criminal Evidence (now merely rules of evidence). Under *Kelly,* before admitting scientific evidence, a trial court must make a "threshold determination" as to whether the testimony will help the trier of fact understand the evidence or determine a fact in issue. *See id.* at 572. Thus, when the trial court is faced with a proffer of expert testimony on a scientific topic unfamiliar to jurors, the trial court's first task is to determine whether the testimony is sufficiently reliable and relevant to help the jury (fact finder) in reaching an accurate result. *See id.* If the trial court determines that the proffered expert testimony is reliable (i.e., probative and relevant),[12] the trial court must next determine

---

12. *Kelly* further explained how the reliability prong of the test of admissibility should be met. To be considered reliable, scientific evidence must satisfy three criteria. First, the underlying scientific theory must be valid. Second, the technique applying the theory must be valid. Third, the technique must have been properly applied on the occasion in question. *See id.* at 573; *Griffith v. State,* 976 S.W.2d 241, 244 (Tex.App.—Amarillo 1998, pet. ref'd).

A test similar to *Kelly* applies under the federal rules. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 590–92, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). For a discussion of the *Daubert* and *Kelly* standards and the standards now applicable to non-scientific expert testimony, see *Roise v. State,* 7 S.W.3d 225 (Tex.App.—Austin 1999, pet. filed); compare *Nations v. State,* 944

whether the proffered testimony's probative value is substantially outweighed by the danger of unfair prejudice. *See* Tex.R. Evid. 403. If the evidence is determined to be admissible, then the jury is permitted to hear it. *See Fuller v. State,* 827 S.W.2d 919, 930 (Tex.Crim.App.1992).

It is clear that *Kelly* announced that DNA identification evidence (RFLP method) is admissible in Texas. *See Kelly,* 824 S.W.2d at 574; *Griffith v. State,* 976 S.W.2d 241, 244–45 (Tex.App.—Amarillo 1998, pet. ref'd). *Campbell v. State,* 910 S.W.2d 475 (Tex.Crim.App.1995), recognized the *Kelly* holding and held that the results of the PCR analysis or method of DNA testing was also admissible in evidence. *See* 910 S.W.2d at 479. In discussing the PCR method, the court noted that the test was less exact than the RFLP method but had other advantages. *See id.* at n. 6.

There are a multitude of Texas cases following *Kelly* and holding DNA identification evidence admissible. *See, e.g, Trevino v. State,* 991 S.W.2d 849, 851–52 (Tex.Crim.App.1999); *Wolfe v. State,* 917 S.W.2d 270, 274 (Tex.Crim.App.1996); *Hicks v. State,* 860 S.W.2d 419, 424 (Tex.Crim.App.1993); *Hepner v. State,* 966 S.W.2d 153, 160 (Tex.App.—Austin 1998, no pet.); *Barnes v. State,* 839 S.W.2d 118, 123–24 (Tex.App.—Dallas 1992, pet. ref'd); *Coleman v. State,* 833 S.W.2d 286, 288 (Tex.App.—Houston [14th Dist.] 1992, pet. ref'd).

Nearly all the cases we have examined in our research, both published and unpublished, have found the DNA identification evidence reliable and relevant and thus admissible in evidence and a factor to be considered in determining the sufficiency of the evidence to support the conviction. Sufficiency, however, not admissibility, is the issue in the instant case. In some of the examined cases, the DNA evidence

was superfluous in light of other independent evidence of the defendant's guilt. In other cases, the DNA evidence was an important link in the determination of guilt, and in still other cases, the DNA evidence was the crucial piece of the State's proof, corroborated by lesser pieces of evidence.

### Appellant's Argument

Appellant argues that DNA testimony can exclude an individual as being the donor of blood, semen, or other trace evidence, but that DNA evidence, which does not exclude an individual as the perpetrator of a crime, can only be construed in terms of probability. He contends that the DNA evidence in the instant case is legally insufficient to prove his identity, an essential element of the State's case.

Appellant indicates that his research has failed to reveal a Texas case holding that DNA evidence standing alone is sufficient to sustain a conviction. The State cites *Williams v. State,* 848 S.W.2d 915 (Tex. App.—Texarkana 1993, no pet.), where the defendant was convicted of aggravated sexual assault, as in the instant case. This is the closest Texas case on point. The facts in *Williams* shows that in the early morning hours, the victim's apartment door was kicked in. The victim's face was covered, and she was sexually assaulted by two assailants. She could not identify her assailants. *See id.* at 916. The DNA testing revealed that the DNA pattern found in the defendant's known blood matched the DNA pattern in the blood from the seminal fluid taken from the victim.[13] *See id.* An expert testified that based on the DNA testing, there was a 1 in 12,500,000 chance that the blood found in the seminal fluid taken from the victim's vaginal area was not that of the defendant. *See id.* at 917. The victim testified that she worked with the defendant's wife, that he had been

S.W.2d 795 (Tex.App.—Austin 1997, pet. ref'd).

13. The defendant was shown to be a secretor—that is, he secretes traces of blood in his bodily fluids, such as saliva or semen. *See Williams,* 848 S.W.2d at 916.

to her apartment, and once, in a strange conversation, inquired whether anyone had performed oral sex on her. *See id.* at 916. She testified that she knew a Roger Day by name only. *See id.* at 917.

The defendant offered alibi testimony that he was in Florida with his wife on the date in question. His wife's supporting testimony was impeached when she was recalled and admitted that she was at work in Dallas on the date in question and not in Florida. The defendant's brother testified that the victim was dating Roger Day. Day testified that he had sexual intercourse with the victim on the date in question and the defendant was not present. *See id.*

The appellate court concluded that the evidence viewed in the light most favorable to the verdict was legally sufficient to support the conviction. *See id.* at 917. There was no discussion that DNA evidence was the only real inculpatory evidence supporting the conviction. Yet, it is clear the conviction rested upon the DNA evidence.

### Identity Required

 There is no question that the State is required to prove beyond a reasonable doubt that the accused is the person who committed the crime charged. *See Johnson v. State,* 673 S.W.2d 190, 196 (Tex.Crim.App.1984); *Rice v. State,* 801 S.W.2d 16, 17 (Tex.App.—Fort Worth 1990, pet. ref'd). Identity may be proved by direct or circumstantial evidence. *See Earls v. State,* 707 S.W.2d 82, 85 (Tex. Crim.App.1986); *Couchman v. State,* 3 S.W.3d 155, 162 (Tex.App.—Fort Worth 1999, pet. filed); *Creech v. State,* 718 S.W.2d 89, 90 (Tex.App.—El Paso 1986, no pet.). In fact, identity may be proven by inferences. *See United States v. Quimby,* 636 F.2d 86, 90 (5th Cir.1981). When there is no direct evidence of the perpetrator's identity elicited from trial witnesses, no formalized procedure is required for the State to prove the identity of the accused. *See Sepulveda v. State,* 729 S.W.2d 954, 957 (Tex.App.—Corpus Christi 1987, pet. ref'd). Proof by circumstantial evidence is

not subject to a more rigorous standard than is proof by direct evidence. *See McGee v. State,* 774 S.W.2d 229, 238 (Tex. Crim.App.1989). For the purposes of proving guilt beyond a reasonable doubt, direct and circumstantial evidence are equally probative. *See id.*

The instant conviction rests upon circumstantial evidence. Michelle Lockhoof, a DNA analyst with the DPS crime laboratory, testified that based on the RFLP analysis, appellant's known blood and semen matched the semen found on the complainant's nightgown, panty liner, and vaginal swabs taken from the complainant. Lockhoof stated that the reported frequency or chance of appellant's DNA profiling *occurring* in another person was 1 in 5.5 billion for the Caucasian, African–American, and Hispanic populations, and that the *actual* frequency was 1 in 420 billion for the African–American population. The record shows appellant was an African–American. In *Hinojosa v. State,* 4 S.W.3d 240, 245 (Tex.Crim.App.1999), the court stated: "Despite one in 19,900,000 odds, appellant's DNA profile matched the semen found in the victim. Contrary to appellant's argument, *these impressive statistics support the jury's conclusion* that appellant, as opposed to some unidentified 'suspect' also sharing the same DNA profile, sexually assaulted, kidnaped, and killed Wright." (Emphasis added).

In addition to the RFLP test, Dr. David Bing of the Center for Blood Review in Boston, utilizing the PCR method of DNA testing, also *obtained a match between* appellant's known blood and the semen found on a vaginal swab taken from the complainant. Still further, Steve Robertson, the criminologist from the DPS laboratory, reported that tests on appellant's known blood and the semen on the complainant's nightgown could not eliminate appellant as the donor of the semen. Appellant's blood group was found in approximately nine to ten percent of the male population. This was a blood grouping or

blood typing procedure, not a DNA analysis.

### Appellant's Argument

 Nevertheless, appellant argues the DNA evidence was flawed because there were variables affecting the accuracy of that evidence. He contends that Lockhoof and Bing, who testified for the State on the statistical results of DNA testing, were not shown to be experts in the field of statistics and probability and there was no indication they knew anything at all about the statistical techniques regarding the random probability estimates they offered the jury. The State, however, is not required to call a mathematical expert to comment on the possible interpretation of statistical evidence. *See Griffith,* 976 S.W.2d at 251. Neither *Kelly* nor rule 702 makes such a requirement for the admission of DNA evidence. *See id.*

Appellant also complains that the "error rate" of the laboratory was not shown. Apparently appellant is referring to the DPS crime laboratory. Appellant urges the "error rate" would affect the statistical results. The record does not show the error rate of the lab. The lab was certified by ASCLD, as earlier noted, and used protocol in accordance with the guidelines of TWGDAM and the National Research Council. The testing analyst was subject to periodic blind proficiency testing and had never been advised of having made a false match. The lack of error rate for the lab itself would go more to the weight than the admissibility of the DNA evidence. *See United States v. Lowe,* 954 F.Supp. 401, 420 (D.Mass.1996), *aff'd,* 145 F.3d 45 (1st Cir.1998).

 All of appellant's complaints, including those about the data bank, go to the weight or admissibility of the evidence rather than the sufficiency thereof on which appellant bases his appeal. In *Welch,* the defendant claimed, as here, that the DNA evidence failed to establish his identity as the perpetrator of sexual assault charged because it was scientifically unreliable and should not have been admitted. *See* 993 S.W.2d at 694. The *Welch* court pointed out that regardless of whether the evidence was properly admitted, the court must consider it in determining legal sufficiency. *See id.; Nickerson v. State,* 810 S.W.2d 398, 400 (Tex.Crim.App.1991); *Porter v. State,* 969 S.W.2d 60, 63 (Tex. App.—Austin 1998, pet. ref'd). The jury's verdict must be evaluated from the jury's perspective. *See Miles v. State,* 918 S.W.2d 511, 512 (Tex.Crim.App.1996). Any inconsistencies in the testimony should be resolved in favor of the jury's verdict. *See Cain v. State,* 976 S.W.2d 228, 233 (Tex.App.—San Antonio 1998, no pet.).

> It was for the jury, as trier of fact, to determine the proper inferences to draw from the evidence. If the circumstantial evidence, viewed in the light most favorable to the verdict, supports a finding of guilt beyond a reasonable doubt, the evidence is legally sufficient, and it is irrelevant that the jury could have viewed the evidence more favorably to the accused.

*Hepner,* 966 S.W.2d at 157.

All of the elements of the instant offense are supported by direct evidence except the identification of appellant as the perpetrator of the crime, which rests upon circumstantial evidence. The DNA (RFLP analysis) evidence was "strong evidence" of appellant's participation in the crime. When this evidence is considered in relation to the other DNA test and the blood grouping test, the conclusion that appellant was the perpetrator is warranted by the combined and cumulative force of all the circumstances. *See Skinner v. State,* 837 S.W.2d 718, 722 (Tex.App.—Fort Worth 1992, pet. ref'd).

 Viewing the evidence in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt all the essential elements of the offense charged.

Except for *Williams,* our holding in the instant case borders on being one of first impression with regard to DNA evidence establishing identity. We therefore have examined cases from other jurisdictions to see if they support our conclusion.

### Other Jurisdictions

Outside of Texas, we find that the New York court in *People v. Rush,* 165 Misc.2d 821, 630 N.Y.S.2d 631 (N.Y.Sup.Ct.1995), *aff'd,* 242 A.D.2d 108, 672 N.Y.S.2d 362 (1998), was confronted with the same question we are: "In a criminal prosecution can DNA evidence alone establish a legally sufficient case of a defendant's guilt?" 630 N.Y.S.2d at 631. In this rape and robbery case, the court noted the general acceptance of the notion that a defendant accused or convicted of a crime could be exculpated by DNA evidence alone, but the court could not find a reported New York decision that DNA evidence alone can inculpate a defendant sufficiently to support a guilty verdict. The New York trial court then answered the question in the affirmative.

The victim in *Rush* identified her assailant's photograph from a photographic array and identified him in a corporeal line-up. At trial, however, the victim identified a courtroom spectator as her assailant. Under New York law, evidence of the pre-trial identification had to be excluded. Evidence of identification came primarily from an FBI agent, an expert in DNA analysis. He reported that in his DNA profiling test, four out of six "genetic loci" that he tested from anal and vaginal swabs taken from the victim matched the known blood sample of the defendant. The agent-expert concluded "that the probability of selecting another individual at random from the population that would have the same set of DNA profiles was less than 1 in 500 million for the black, the white, and the Hispanic populations." 630 N.Y.S.2d at 632. The only other evidence of identity was the testimony of an acquaintance of the defendant who saw him

in the vicinity of the crime three days before the crime took place. *See id.*

The *Rush* court observed that the evidence of the defendant's guilt was circumstantial and that DNA profiling evidence was a relatively new theory in New York trials. The court cited *People v. Wesley,* 83 N.Y.2d 417, 611 N.Y.S.2d 97, 633 N.E.2d 451, 453 (1994), in which New York highest state court determined that DNA evidence was admissible and that such "evidence consisting of unique genetic characteristics belonging to an individual, can provide *strong evidence* of a person's presence and participating in *a criminal act.*" *Rush,* 630 N.Y.S.2d at 633 (emphasis added).

The *Rush* decision also considered the only two reported decisions upholding that criminal convictions where the sole evidence linking the defendant to the crime was DNA evidence. 630 N.Y.S.2d at 633. In *Springfield v. State,* 860 P.2d 435 (Wyo. 1993), the victim in a rape prosecution was unable to make an in-court identification of the defendant who only "resembles" her attacker. The DNA expert found a match between the defendant's blood sample and samples recovered from a stain on the victim's panties and from her anus. The probability that another Indian person would have the same DNA was estimated to be at 1 in 250,000. The Wyoming Supreme Court concluded that "the evidence was sufficient for 'reasonable and rational individuals' to conclude that the [defendant] was the perpetrator." *Springfield,* 860 P.2d at 449.

The decision in *People v. Soto,* 35 Cal. Rptr.2d 846 (Cal.Ct.App.1994), cited by *Rush,* was later affirmed in 21 Cal.4th 512, 88 Cal.Rptr.2d 34, 981 P.2d 958 (Cal.1999). *Soto* upheld the defendant's rape conviction where the identifying evidence came solely from DNA testimony. The victim was unable to identify her assailant because he wore a mask during the attack. A DNA match between a seminal stain on the victim's bedspread and the defendant's blood resulted in the statistical probability

of 1 in 189 million that another Hispanic could have provided the sample. The California court determined that "corroboration of identifying evidence was not required for DNA comparison." *Soto*, 35 Cal.Rptr.2d at 859.

The *Rush* opinion observed that the holdings in the *Springfield* and *Soto* cases are consistent with the recognition and approval lawyers and judges have recently bestowed on DNA evidence. *Rush*, 630 N.Y.S.2d at 633. The court then concluded:

Identification evidence from an eyewitness inculpating a defendant, which can be unreliable and the product of suggestiveness, would not be relied upon by a court in the face of contradictory DNA evidence. Why then should not the opposite be true—that DNA evidence should be relied upon, even in the face of contradictory eyewitness identification evidence exculpating a defendant? Indeed, that is exactly what the jury had done here in finding the defendant guilty.

The DNA evidence at the trial was the product of careful evaluation by a recognized expert in a prominent laboratory using a scientific technique to determine a statistical probability. The eyewitness identification evidence came from an injured and traumatized rape victim using impaired vision while in the unfamiliar capacity of a witness in a strange courtroom setting.

DNA evidence is not completely infallible—no evidence is. Although it has been proclaimed as "virtually infallible" and "a breakthrough that 'could revolutionize law enforcement,'" this court is well aware that there may be "a significant margin of error in scientific analysis." Critics of forensic science are able to cite examples of sloppy laboratory performance to support their claim that there is room for "drastic improvement." There can be little doubt, however, that the perils of eyewitness identification testimony far exceed those presented by

DNA expert testimony. Acquittals in criminal prosecutions based entirely on eyewitness identification evidence are legion, as are reversals and vacaturs of convictions premised entirely on such evidence. New York State courts have even given serious consideration to admitting expert testimony to discredit eyewitness identification evidence. *See People v. Mooney*, 76 N.Y.2d 827, 560 N.Y.S.2d 115, 559 N.E.2d 1274 (1990); *see also People v. Green*, 151 Misc.2d 194, 573 N.Y.S.2d 113 (N.Y.Co., S.Ct. 1991). Where the prosecution is confronted with an irreconcilable conflict between eyewitness identification evidence and DNA identification evidence, it is likely to rely on the DNA evidence. *See People v. Dabbs*, 154 Misc.2d 671, 587 N.Y.S.2d 90 (Westchester Co., S.Ct. 1991).

This court is, therefore, satisfied that the testimony of even one DNA expert that there is a genetic match between the semen recovered from the victim of a rape and the blood of the defendant, a total stranger, and the statistical probability that anyone else was the source of that semen are 1 in 500 million is legally sufficient to support a guilty verdict. The defendant's motion for a trial order of dismissal is, therefore, denied.

*Rush*, 630 N.Y.S.2d at 633–34.

In affirming the above quoted *Rush* decision, the Appellate Division, Second Department, of the Supreme Court of New York, wrote:

The defendant first claims that DNA evidence cannot serve as the sole evidence supporting his conviction because it is circumstantial in nature and is not absolute or infallible. This claim is not persuasive. Virtually no evidence is absolutely conclusive in its probative import, and the defendant cites no authority which imposes such a standard of absolute certitude (*cf., People v. Geraci*, 85 N.Y.2d 359, 367, 625 N.Y.S.2d 469, 649 N.E.2d 817; *People v. Bethune*, 105 A.D.2d 262, 271, 484 N.Y.S.2d 577; *see,*

*Springfield v. State,* 860 P.2d 435 [Wyo] ). Legal sufficiency "does not mean that absolute or metaphysical certainty is required" (*People v. Eckert,* 2 N.Y.2d 126, 129, 157 N.Y.S.2d 551, 138 N.E.2d 794). Further, it is well settled that "[c]ircumstantial evidence is not a disfavored form of proof and, in fact, may be stronger than direct evidence" (*People v. Geraci, supra,* at 369, 625 N.Y.S.2d 469, 649 N.E.2d 817; *see also, People v. Benzinger, supra,* [36 N.Y.2d 29,] at 32 [364 N.Y.S.2d 855, 324 N.E.2d 334]; *People v. Leach,* 57 A.D.2d 332, 336, 394 N.Y.S.2d 722, *aff'd* 46 N.Y.2d 821, 414 N.Y.S.2d 121, 386 N.E.2d 1088). It has been observed that "[c]ircumstantial evidence is frequently more reliable and stronger than direct proof by eyewitness testimony" (*People v. Gallo,* 75 A.D.2d 148, 153, 431 N.Y.S.2d 1009; *People v. Benzinger, supra* at 32; *cf., People v. Mooney,* 76 N.Y.2d 827, 828–833, 560 N.Y.S.2d 115, 559 N.E.2d 1274 [Kaye, J., dissenting] ).

*Rush,* 672 N.Y.S.2d at 363–64.

 Finding our conclusion in general accord with other states' cases, we overrule appellant's first point of error challenging the legal sufficiency of the evidence.[14]

### Factual Sufficiency

 In his second point of error, appellant challenges the factual sufficiency of the evidence to support the conviction. A review of the factual sufficiency of the evidence begins with the presumption that the evidence supporting the conviction was *legally* sufficient. *See Clewis v. State,* 922 S.W.2d 126, 134 (Tex.Crim.App.1996). In a challenge to the *factual* sufficiency of the evidence, we view the evidence without employing the prism of "in the light most favorable to the verdict." *Id.; Stone v. State,* 823 S.W.2d 375, 381 (Tex.App.— Austin 1992, pet. ref'd, untimely filed). A reviewing court must consider all of the evidence impartially, comparing evidence that tends to prove the existence of a disputed fact or facts with evidence that tends to disprove that fact or those facts. *See Santellan v. State,* 939 S.W.2d 155, 164 (Tex.Crim.App.1997). The verdict or judgment is to be set aside only when the factual finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Clewis,* 922 S.W.2d at 129. In factual sufficiency analysis, it must be remembered that the trier of fact is the sole judge of the weight and credibility of the testimony. *See Santellan,* 939 S.W.2d at 164. Appellate courts should be on guard not to substitute their own judgment in these matters for that of the trier of fact. *See id.* One principle of a factual sufficiency analysis is deference to the findings of the jury or other fact finder. *See Cain v. State,* 958 S.W.2d 404, 407 (Tex.Crim.App. 1997). Appellate courts should exercise their jurisdiction to review the factual sufficiency of the evidence only to prevent manifestly unjust results; they are not free to reweigh the evidence and set aside a jury verdict merely because the judges believe a different result is more reasonable. *See Reaves v. State,* 970 S.W.2d 111, 115 (Tex.App.—Dallas 1998, no pet.) (citing *Cain,* 958 S.W.2d at 407; *Clewis,* 922 S.W.2d at 135). "A decision is not manifestly unjust merely because the jury [or fact finder] resolved conflicting views of the evidence in favor of the State." *Cain,* 958 S.W.2d at 410. "Courts of Appeals are not at liberty to engage in fact finding." *Id.* at 409. Yet, in *Clewis,* 922 S.W.2d at 133, the court also wrote: "In conducting the factual sufficiency review, an appellate court reviews the fact finder's weighing of the evidence and is authorized to disagree with the fact finder's determination."

After the above was written, the Court of Criminal Appeals handed down *Johnson v. State,* No.1915–98, —— S.W.3d ——, 2000 WL 140257 (Tex.Crim.App. Feb.9, 2000), supposedly clarifying *Clewis* and ad-

---

14. Caution is advised. Each case based on properly analyzed DNA evidence must stand on its own merits. Other admissible identity evidence should not be disregarded.

dressing the factual sufficiency controversy. In *Johnson*, the court rejected the contention that the factual sufficiency review in criminal cases is " 'unworkable' as it is generally applied." *Id.* at ——. In clarifying *Clewis*, the court stated:

> We conclude the Court of Appeals was correct in this respect, and the appropriate scope of the *Clewis* criminal factual sufficiency review does, in fact, encompass both formulations utilized in civil jurisprudence, i.e., that evidence can be factually insufficient if (1) it is so weak as to be clearly wrong and manifestly unjust or (2) the adverse finding is against the great weight and preponderance of the available evidence. Because the State always carries the burden of proof to establish the elements of a criminal offense at trial, an appellant's points of error challenging the sufficiency of the evidence used to establish the elements of the charged offense could claim that the evidence used to establish the adverse finding was so weak as to be factually insufficient. This is the most equitable approach, especially given the fact criminal defendants are not under any obligation to present evidence on their behalf and usually rely, instead, on forcing the State to prove its case beyond a reasonable doubt. Alternatively, in the event a defendant does muster contrary evidence, this standard of review allows him, if he so chooses, to present the argument on appeal that his evidence greatly outweighed the State's evidence to the extent that the contrary finding is clearly wrong and manifestly unjust. We hold, therefore, that our opinion in *Clewis* is to be read as adopting the complete civil factual sufficiency formulation. Borrowing in part from Justice Vance's concurring opinion in *Mata v. State*, 939 S.W.2d 719, 729 (Tex. App.—Waco 1997, no pet.), the complete and correct standard a reviewing court must follow to conduct a *Clewis* factual sufficiency review of the elements of a criminal offense asks whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. Adoption of this complete standard allows us to remain true to one of the stated goals of *Clewis*, harmonization, when appropriate, of civil and criminal jurisprudence, and it recognizes the State's burden at a criminal trial is proof beyond a reasonable doubt.

*Id.* at —— - —— (footnote omitted).

*Johnson* is not yet final. The mandate has not yet issued. Thus, it is not binding precedent at this time. However, we will apply it here to prevent unnecessary remand. In the instant case, the issue in question is identity, an element of the offense upon which the State bore the burden of proof beyond a reasonable doubt. Although appellant cross-examined the State's witnesses, he offered no evidence at all. Appellant's claim falls under the first prong of the civil or *Clewis–Johnson* modified test. His second point of error will be reviewed as a claim that the evidence supporting the jury's adverse finding of identity is so weak as to be factually insufficient.

The evidence need not be reiterated at length. The State's evidence as to identity was based on the DNA (RFLP analysis) test supported by the DNA (PCR analysis) test, and the blood grouping test. Appellant offered no contrary evidence. We have examined all of the evidence impartially—a neutral review—and do not find that proof of identity is so obviously weak as to undermine the confidence in the jury's determination. Giving due deference to the jury's verdict, we conclude that the verdict is not so contrary to the overwhelming weight of evidence as to be clearly wrong and unjust. The second point of error is overruled.

The judgment is affirmed.