TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-07-00733-CR






Bowan Williams, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT

NO. D-1-DC-07-904047, HONORABLE MICHAEL LYNCH, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 A jury convicted Bowan Williams of two counts of aggravated assault and one count 

of deadly conduct with a deadly weapon. See Tex. Penal Code Ann. § 22.02(a)(1), (2) (West Supp.
2008); § 22.05(b) (West 2003). The district court assessed punishment at 26 and 20 years'
imprisonment for the two counts of aggravated assault and ten years' imprisonment for the offense
of deadly conduct with a deadly weapon. In a single issue on appeal, Williams challenges the factual
sufficiency of the evidence establishing his identity as the assailant. We will affirm the judgment.


BACKGROUND

 The jury heard evidence that, on the morning of October 5, 2006, at approximately
4:15 a.m., the victim, Daniyell Wright, was shot and assaulted by a man dressed in black. Wright
testified that the assault occurred when she and her boyfriend, Mitchell Thompson, were leaving
Wright's apartment to go to work. According to Wright, as she and Thompson were headed toward
the parking lot, she looked over her shoulder and saw somebody "standing in black with a gun." 
Wright "took off running," until her leg gave out on her and she fell to the ground. Although she
did not immediately realize it, Wright had been shot in the leg. After Wright fell to the ground, she
testified, the assailant approached her and started hitting her in the head. Wright did not know if the
assailant was hitting her with his gun or his fists, but she recalled covering her head with her hands
in an attempt to defend herself. At some point, according to Wright, the assailant dropped the gun,
she picked it up, and the assailant "started running." As the assailant ran away, Thompson ran over
to Wright and helped her up. They returned to Wright's apartment, where they called the police.

 Wright told Thompson, the police, and paramedics that the assailant was her ex-boyfriend, whom she identified as "Byron Williams." (1) Wright also identified Williams in court as
the man who attacked her. During her trial testimony, when the State asked Wright how she knew
it was Williams who had shot her, Wright testified that she "just knew it was him" because she had
been dating Williams for four years, had "seen him before in the black [clothing]," and "knew his
posture, [] knew the way he stood and everything." Wright described the man who assaulted her as
wearing black pants, a black hoodie, and a black scarf "that had white in it." Wright explained that,
on an occasion in 2004, two years prior to the assault, Williams had come to her house "dressed up
in black," wearing black pants and a black hoodie that "were the same or looked the same" as those
worn by the assailant. 

 When asked to describe what part of her assailant she was able to see during the
assault, Wright testified, "I just seen the black. I didn't see the eyes or anything like that because it
was dark and the hood was covering [his face]." When asked if there was anything else about her
assailant that she recognized, Wright testified that, when the assailant ran off, she "knew his run." 
Wright explained, "When [Williams] stands he is kind of bowlegged, and when he runs, it is kind
of to the side a little bit." Wright also testified that she recognized Williams's "height, his weight,
his posture." When asked what was unique about Williams's posture that made it identifiable to her,
Wright testified, "Just his build, I know his build. I was with him for four years." 

 The State elicited further testimony from Wright about the nature of her four-year
relationship with Williams. Wright testified that, during the time she and Williams had been dating,
they were physically and sexually intimate. Wright also testified that, during their relationship, she
and Williams "always argued." When asked what they frequently argued about, Wright testified,
"Mostly was the jealousy. He didn't want me talking to other dudes, or he would always ask me
what dude talked to me today or who I talked to today." Wright testified that she ended her
relationship with Williams at the end of June or July 2006.

 Wright further testified that, after the relationship ended, she and Williams continued
talking on the phone. Wright described one particular phone conversation that occurred
approximately one week before the assault:


Q: What were you all talking about in that phone call?


A: He was telling me that he missed me, how he wanted to get back with me and
that he couldn't live without me.


Q: Was that the first time since you broke up that he said he wanted to get back
together with you?


A: No, that wasn't the first time.


Q: How often did that happen?


A: Just about every day.


Q: Okay. And you would tell him no every time?


A: Right, and that I wasn't happy, that I couldn't be with somebody that treated
me like that.


Q: This particular phone call that week before, do you remember what else he
was saying?


A: Well, as soon as I said that I couldn't get back with him or I wasn't happy, it
was like his whole attitude changed, and then he started talking about how he
had thoughts of killing me and that if he couldn't have me that nobody else
could, and then he was telling me about his grandma, how she was somebody
that was very important to him and she raised him since he was little and that
I was important to him, and since she passed away and that I didn't want to
be with him no more, he told me that nobody--he was going to mess me up
so bad that nobody else would want me.


After the State briefly interrupted Wright's testimony to ask her if she was "all right," Wright
continued, "He told me . . . that he didn't care if he went to jail or not, and if anything was to happen
to me, that he said that he was going to act like he didn't know what happened."

 After the assault, Wright sought and obtained a protective order against Williams. 
A transcript of Wright's prior testimony from the protective-order hearing was admitted into
evidence. Wright's testimony at the hearing was largely consistent with her testimony at the criminal
trial. At trial, the State asked Wright to repeat her answers from various questions that were asked
during the hearing. One particular line of questioning to which the State directed the jury's attention
was the following:

Q: And how certain are you that [the assailant] was Mr. Williams?


A: Very certain.


Q: 100 percent certain?


A: Yes.



 Mitchell Thompson also testified about his recollection of the assault. Thompson
recalled that, as he and Wright were headed toward his car, he heard a male voice say "what the
f***." Thompson turned to his right and saw a spark from a gunshot directed toward himself and
Wright. At this point, Thompson recounted, he and Wright started running, and they soon separated. 
According to Thompson, the gunman stayed with him, and Thompson turned around and ran in
another direction to try and dodge the bullets. Thompson could hear the gun firing as he ran, and
he estimated that he heard at least five or six shots. Thompson testified that there was lighting in
the area that enabled him to see the person who was holding the gun. When asked to describe this
person, Wright testified, "He had on all black. Black jeans, a hoodie, and a scarf over his face." 
Thompson could also tell that the shooter was a man. Although Thompson could not determine the
assailant's race, from the small portion of the man's face that was uncovered, Thompson "knew he
wasn't white." (2) 

 Thompson also testified that, at some point while he was running, he heard Wright
screaming and ran over to her. Thompson saw the assailant on top of Wright. Once the assailant
saw Thompson coming, according to Thompson, the assailant ran away. Thompson testified that
he started to chase after the assailant, but then decided to attend to Wright. As the assailant ran
away, Thompson observed that the man "had a limp, like something was wrong with his leg or
something." Thompson testified that he perceived the assailant as "actually bigger than me and a
little shorter." Thompson clarified that, by "bigger," he meant "stockier." Thompson testified that
he (Thompson) was around six feet and four inches tall and weighed 225 pounds. Earlier in the trial,
Wright had described Williams as being six feet tall and weighing about 230 pounds. 

 When Wright and Thompson returned to the apartment after the assault, they had in
their possession the gun the assailant had dropped. Wright testified that she recognized the gun. 
According to Wright, on the day in 2004 that Williams had come over to her house dressed in black,
she had seen him holding a gun that was "the same shape and the same color" as the gun used by the
assailant. The police, after taking custody of the gun, determined that the gun was not registered
to Williams, and they were unable to trace the gun's ownership. 

 The police tested the gun for latent prints. A latent print, according to the State's
fingerprint expert, Officer Joseph Flores of the Travis County Sheriff's Office, "is the pattern left
by friction ridges when you touch an object." Officer Flores testified that he recovered a latent palm
print off of the side of the magazine of the gun. Flores was able to get "three lifts" off of the print
that were of "very good quality." (3) When Flores compared the print recovered from the gun against
Williams's palm print, Flores found fifteen "points of reference" matching Williams's print. 
According to Flores, the standard operating procedure for the Travis County Sheriff's Office is
"a minimum of eight points of reference for a positive ID." Flores testified that he saw additional
points of reference on the print, but he stopped at fifteen points because "he was running out of room
to draw [the points of reference]." 

 The police further analyzed the gun for the presence of DNA. Jody Koehler, the
State's DNA expert, testified that the DNA profile obtained from the gun was consistent with
Wright's DNA profile. However, the DNA profile was not consistent with the DNA profiles of
either Williams or Thompson. According to Koehler, this meant that the DNA of Williams and
Thompson "was not detected in that DNA profile," and they were "excluded as contributors." 
Koehler went on to explain, however, that "sometimes the DNA may be present but it is below a
detectible level, . . . It doesn't mean it is not there. It just means it is lower than a detectible level." 
Koehler also testified that the process used to lift latent prints from an item makes it difficult to
subsequently detect DNA on that item.

 The morning following the assault, the police attempted to contact Williams. 
Detective Michael Straun of the Travis County Sheriff's Office called Williams and left a message,
asking Williams to call him back. Williams did not return the call until later in the afternoon. 
Detective Straun was off duty when Williams called back, so Williams spoke instead with Detective
Chris Rowland, the lead detective in the investigation. Detective Rowland testified that, initially,
all he told Williams was that an ex-girlfriend of Williams's had been shot and that the police were
investigating the shooting. Rowland also told Williams that it was "normal protocol in this situation
to reach out to any ex-boyfriends, ex-friends with a grudge or anything like that and begin to ask
them to come in and talk to me about the incident that occurred." Rowland testified that, when he
eventually revealed to Williams that the woman who had been shot was Wright, Williams claimed
that he and Wright had not dated "in a long time." Rowland testified that Williams did not express
any concern for Wright during the conversation. Rowland also testified that, when he asked
Williams to come in for questioning, Williams told him that he was in Dallas that weekend for the
Texas-Oklahoma game (the phone conversation between Williams and Rowland occurred on a
Friday), but that he would be willing to come in to the station later, perhaps on Sunday. However,
according to Rowland, Williams never came in to the station.

 The only witness to testify for the defense was Williams's friend, Jeffrey Rosenboro. 
Rosenboro, who lived in Dallas at the time of the assault, testified that he found Williams asleep on
his couch at approximately 5:15 a.m. on the morning the assault occurred. According to Rosenboro,
Williams had come up to Dallas that weekend for the Texas-Oklahoma game. Williams, Rosenboro
recounted, was a "very close friend" of his who visited Rosenboro on a regular basis and had a key
to his home. Rosenboro testified that Williams was his guest the entire weekend, through Monday
morning. On Friday, according to Rosenboro, he and Williams "went car shopping" after Rosenboro
got off from work. Rosenboro testified that he and Williams also attended the State Fair
that weekend, but they "didn't get to the [Texas-Oklahoma] game because the tickets was [sic]
too expensive." 

 The jury found Williams guilty of two counts of aggravated assault and one count
of deadly conduct as charged in the indictment. Williams was sentenced to 26 years' and 20 years'
imprisonment for the two aggravated assault counts, and ten years' imprisonment for the deadly
conduct offense. This appeal followed.

 

STANDARD OF REVIEW

 Williams challenges only the factual sufficiency of the evidence. In a factual
sufficiency review, we view all the evidence in a neutral light and ask whether a trier of fact was
rationally justified in finding guilt beyond a reasonable doubt. See Watson v. State, 204 S.W.3d 404,
414 (Tex. Crim. App. 2006). We "must be cognizant of the fact that a jury has already passed on
the facts and must give due deference to the determinations of the jury." Lancon v. State,
253 S.W.3d 699, 704-05 (Tex. Crim. App. 2008). A verdict should be set aside only if the evidence
supporting the verdict is so weak as to render the verdict clearly wrong or manifestly unjust. Id. at
705; Korell v. State, 253 S.W.3d 405, 412 (Tex. App.--Austin 2008, pet. ref'd).


ANALYSIS

 In his sole issue on appeal, Williams asserts that the evidence is factually insufficient
to prove his identity as the perpetrator of the assault. Identification of the defendant as the person
who committed the offense charged is part of the State's burden of proof beyond a reasonable doubt. 
Miller v. State, 667 S.W.2d 773, 775 (Tex. Crim. App. 1984); Wiggins v. State, 255 S.W.3d 766, 771
(Tex. App.--Texarkana 2008, no pet. h.). Identity may be proven by direct evidence, circumstantial
evidence, or reasonable inferences from such evidence. Roberson v. State, 16 S.W.3d 156, 167
(Tex. App.--Austin 2000, pet. ref'd). Juries are permitted to make reasonable inferences from the
evidence presented at trial, and circumstantial evidence is as probative as direct evidence in
establishing the guilt of an actor. Hooper v. State, 214 S.W.3d 9, 14-15 (Tex. Crim. App. 2007).

 In this case, the evidence supporting the jury's finding that Williams was the
perpetrator of the assault included the following:


 Wright testified that she "just knew it was [Williams]" who assaulted her because she
recognized several of Williams's physical features in the assailant, including his height, his
weight, his posture, and the way he ran "kind of to the side a little bit." Wright was familiar
with these features because she had been in a physically and sexually intimate dating
relationship with Williams for four years prior to the assault.

 Wright testified that the assailant was dressed in black pants and a black hoodie that "were
the same or looked the same" as clothing she had seen Williams wear on a prior occasion.

 Wright testified that, while she and Williams were dating, they would "always argue,"
"mostly about" Williams's jealousy of Wright talking to other men. When Wright was
assaulted, she was with her new boyfriend, Thompson.

 Wright testified about a phone conversation she had with Williams after they broke up and
approximately one week prior to the assault. In the conversation, according to Wright,
Williams spoke of how "he couldn't live without" Wright, how "he had thoughts of killing"
Wright, how, if he could not have Wright, "that nobody else could," how he was "going to
mess [Wright] up so bad that nobody else would want [her]," and how "he didn't care if he
went to jail or not, and if anything was to happen to Wright," that "he was going to act like
he didn't know what happened."

 Thompson's description of the assailant was consistent with Wright's. Thompson testified
that the assailant "had on all black. Black jeans, a hoodie, and a scarf over his face." 
Thompson also testified that the assailant was a man with a limp, "like something was wrong
with his leg or something." Thompson further explained that he perceived the assailant as
"actually bigger than me and a little shorter." Thompson testified that he was around six feet
and four inches tall and weighed 225 pounds. Earlier in the trial, Wright had described
Williams as being six feet tall and weighing about 230 pounds. 


 


 Detective Rowland testified that, when he told Williams that Wright had been shot, Williams
expressed no concern for her. Williams told Rowland that he had not dated Wright "in a
long time," even though, according to Wright, the relationship had ended only a few months
prior to the assault.

 Wright testified that the gun that was used in the assault was "the same shape and the same
color" as a gun she had seen Williams possess on a prior occasion.

 A palm print "of very good quality" was found on the gun that was used in the assault. 
According to the testimony of Officer Joseph Flores, all that is needed for a positive
identification of a print are eight points of reference. The print lifted from the gun matched
Williams's palm print using fifteen points of reference. 

 In prior testimony at the protective-order hearing, and again during the criminal trial, Wright
testified that she was "very certain" that the assailant was Williams. In fact, when Wright 
was asked if she was "100 percent certain" that the assailant was Williams, she testified,
"Yes."




 The evidence contrary to the jury's finding that Williams was the perpetrator of the
assault consisted of the following:



 During the assault, Wright was unable to identify any facial features of the assailant because
of how dark it was and because of the scarf covering most of the assailant's face.

 For the same reasons, Thompson was unable to identify the assailant's race, other than that
"he wasn't white."

 Williams was "excluded as a contributor" of the DNA found on the gun. Additionally, the
gun was not registered to Williams and the police were unable to trace the ownership of the
gun.

 Rosenboro testified that Williams was at Rosenboro's home in Dallas near the time the
assault occurred.




 Viewing the above evidence in a neutral light, we find that the jury was rationally
justified in finding, beyond a reasonable doubt, that Williams perpetrated the assault. Although it
was dark outside and most of the assailant's face was covered, the jury could have reasonably
concluded that Wright observed enough of the assailant's physical features to be able to positively
identify the assailant as Williams, especially in light of Wright's testimony that she had been
physically and sexually intimate with Williams in a dating relationship for four years prior to the
assault. Furthermore, the jury could have reasonably concluded that Thompson's and Wright's
consistent descriptions of the assailant added credibility to Wright's identification. Also, the jury
could have reasonably inferred that the threatening nature of Williams's alleged remarks to Wright
in a phone conversation the week prior to the assault was evidence that Williams intended to assault
Wright. With regard to the gun used in the assault, there was evidence both in support of and
contrary to the State's theory that it belonged to Williams. We find nothing irrational about the jury
crediting the evidence supporting the State's theory (the palm print lifted from the gun that matched
Williams's palm print, Wright's testimony about having seen Williams with a similar gun) and
discounting the evidence supporting the defense theory (the DNA evidence tending to exclude
Williams as a contributor, the fact that the gun was not registered to Williams). As for Rosenboro's
alibi testimony that Williams was in Dallas when the assault occurred, the jury, as the sole judge of
the credibility of the witnesses, was entitled to disbelieve the testimony of someone who considered
himself "a very close friend" of Williams. The evidence supporting the jury's finding that Williams
perpetrated the assault is not "so weak as to render the verdict clearly wrong or manifestly unjust." 
See Lancon, 253 S.W.3d at 705. We overrule Williams's sole issue on appeal. 


CONCLUSION

 We affirm the judgment of the district court.


 __________________________________________ Bob Pemberton, Justice

Before Chief Justice Law, Justices Puryear and Pemberton

Affirmed

Filed: November 26, 2008

Do Not Publish 
1. Wright testified that she never called Williams "Bowan." Later during trial,
Jeffrey Rosenboro, a friend of Williams, confirmed that, although Williams's first name was
"Bowan," he goes by the name "Byron."
2. The record reflects that Williams is a black male.
3. Officer Flores testified that prints are lifted multiple times in an effort to "get more detail"
from the prints. Because the first lift often includes dust or dirt particles, Flores explained,
subsequent lifts can provide "a better print."